**In The Matter Of The Requested EXTRADITION OF Carlos Guillermo SUAREZ–MASON.**

**No. CR–87–23–MISC.–DLJ.**

United States District Court, N.D. California.

April 27, 1988.

As Amended April 27, 1988.

"Mr. Dailey: We wanted to save as many incumbent Republicans as possible." *Bandemer*, 106 S.Ct. at 2802, n. 5.

See also 672 F.Supp. 1531.

Asst. U.S. Atty. Mark N. Zanides, for Argentina.

J.T. Prada and James D. Riddet, San Francisco, Cal., for respondent.

## ORDER

JENSEN, District Judge.

The Republic of Argentina seeks the extradition of former General Carlos Guillermo Suarez–Mason on the following charges: (1) 43 counts of murder; (2) 24 counts of unlawful deprivation of freedom; and (3) one count of forgery of a public document. This Court's determination involves two sets of issues: *first*, whether Argentina has made the necessary showing to warrant extradition; and *second*, notwithstanding Argentina's showing, whether Suarez–Mason can establish any affirmative defense or bar created by the Treaty of Extradition (i.e., statute of limitations, political offense, military offense).

The extradition request came on for hearing pursuant to 18 U.S.C. § 3184 on March 21 and April 6, 1988. Argentina appeared through Assistant United States Attorney Mark N. Zanides. Suarez–Mason appeared through counsel J.T. Prada and James D. Riddet. The Court has reviewed the documents and affidavits submitted by the Republic of Argentina, the affidavits and testimony submitted by Suarez–Mason, the memoranda and oral arguments of counsel, and now Orders as follows:

(A) The requests for extradition on the charges of murder are GRANTED as to the following 39 victims:

(1) Zelmar Michellini; (2) Hector Jose Gutierrez Ruiz; (3) William Whitelaw; (4) Rosario del Carmen Barredo de Schroeder; (5) Gabriel Eduardo Dunayevich; (6) Federico Martul; (7) Letitia Mabel Akselman; (8) Jacobo Chester; (9) Dardo Cabo; (10) Roberto Rufino Priles; (11) Ana Maria Perdighe; (12) Victorio Perdighe; (13)–(14) Two unidentified victims killed on Jan. 15, 1977; (15) Claudio Edelmiro Ruival; (16) Mario Lerner; (17) Norberto Gomez; (18) Elena Kalaidjian; (19)–(20) Two unidentified victims killed on March 18, 1977; (21) Carlos Alberto Moreno; (22) Rodolfo Goldin; (23) Daniel Ciufo; (24) Catalina Oviedo de Ciufo; (25) Luis Fabbri; (26) Claudio Gimbini; (27) Elizabeth Isabel Kasserman; (28) Mario Sagroi; (29) Esteban Adrian; (30) Luis Maria Gemetro; (31) Maria Cristina Bernat; (32) Julio Francisco Bernat; (33) Luis DeCristofaro; (34) Jorge Oscar Fernandez; (35) Selma del Carmen Mopardo; (36) Alejandra Beatriz Roca; (37) Daniel Arteaga; (38) Carlos Luis Lahitte; and (39) Laura Estela Carlotto.

The requests are DENIED as to the remaining charges of murder.

(B) The request for extradition on the forgery charge is GRANTED.

(C) The requests for extradition on the unlawful deprivation of freedom charges are BARRED by Article 7(1)(c) of the Treaty of Extradition and the applicable statute of limitations stated in 18 U.S.C. § 3282. Therefore, the request for extradition on these charges is DENIED.

Accordingly, the Court certifies the extraditability of Carlos Guillermo Suarez–Mason to the Secretary of State of the United States on the requested charges of murder and forgery described by this Order.[1]

## I.

A. *Historical Context—"The Dirty War"*

The present proceeding arises out of events which occurred in the mid to late 1970s during Argentina's so-called "dirty war" against suspected subversion.[2] Since 1930 Argentina's history has been marked by political instability and episodes of mili-

---

1. The parties have stipulated that this Extradition hearing is also to be considered as a habeas corpus proceeding. Accordingly, the petition for writ of habeas corpus is DENIED.

2. The phrase "dirty war" is based on the descriptions of high ranking military personnel who participated in the war against subversion. *See* statement of Dr. Tom Farar, member of Inter-American Human Rights Commission, vol. L–1, doc. G at 82 (military leaders made "continual mentions of the existence of a 'dirty war' "). *See also* Decision of Argentine Court of Appeal, A–2 at 15–16 ("when the commanding officers attempted to explain the manner in which victory had been achieved, they were forced to refer to the inequivocal concept of 'dirty war' ").

tary intervention into civilian governance. Beginning in the late 1960's the nation was confronted by numerous violent terrorist incidents committed for political purposes by groups representing both extremes of the ideological spectrum. Following the death of President Juan Peron in July 1974, this terrorism increased considerably. On November 6, 1974, President Maria Peron, acting pursuant to Article 23 of the Argentine Constitution, declared a "State of Siege." [3] This action vested the police and national security forces with extensive power to investigate persons suspected of subversion.

By October, 1975, the executive branch of the government concluded that the police and security forces were incapable of combatting the terrorist threat. Therefore, by a series of decrees (L–17, p. 24–28), the government established a defense council and ordered that:

> The Armed Forces, under the Command of the President of the Nation, exercised through the Defense Council, will proceed to carry out military and security operations they deem[ ] necessary to annihilate subversive elements throughout the country.

*Decree 2772*, vol. L–17 (Part One).[4]

Pursuant to these decrees, the Defense Council issued several secret written orders to the Armed Forces. The first two, Directives 1/75 and 404/75 (A–1, Docs. A & B), gave the Army authority over all the nation's police forces. However, with the nation stumbling under an annual inflation rate of over 700%, the political situation became further destabilized and on March 24, 1976, the Armed Forces' commanders carried out a *coup d'etat* and ousted the civilian government. The new ruling military junta continued the state of siege and passed legislation providing that civilians

accused of subversion would be judged by military law. *See* Law 21.264, art. 7, in vol L–17 (Part One).

In the course of the next three years, the military (led by the Army) undertook a massive campaign to crush the terrorist threat. In the words of the Army representative on the first junta, the objective of this "dirty war" was to put an end to "subversive thought." *See, e.g., Nunca Mas: The Report of the Argentine National Commission on the Disappeared*, volume L–18 (Part Two) at xiii (quoting General Jorge Videla in introduction by Ronald Dworkin). Its method was direct: abduct anyone they suspected of subversion off the street or out of their homes; transport them to secret detention centers; torture them physically, psychologically, and often sexually; and, in vast numbers, kill them. Indeed, the tactics used in the Army's campaign were so brutal, so inhuman, that were they not so well-documented they would challenge belief.

According to the consistent findings of both the Argentine Courts and other authorities, the Army committed an array of crimes ranging from illegal detention, torture, and rape, to murder. Tens of thousands of people were detained without charges, and by most estimates over 12,000 people were "disappeared," never to be seen again. *See, e.g., Decision of the Federal Criminal and Correctional Court of Appeals of the Republic of Argentina*, volume A–2 at 6–11. *See also Nunca Mas, supra;* Organization of American States, *Report on The Situation of Human Rights in Argentina* (1980), L–18 (Part One). These tactics were employed against persons said to be subversives, at times on the flimsiest of evidence. *See, e.g.,* United States Department of State, *Country Re-*

---

3. Article 23 of the Argentine Constitution provides:

"In the event of internal disorder or foreign attack endangering the operation of this Constitution and the authorities created thereby, the Province or territory in which the disturbance of order exists shall be declared in a state of siege and the constitutional guarantees suspended therein. But during such suspension the President of the Republic shall not convict or

apply punishment upon his own authority. His power shall be limited, in such a case, with respect to persons, to arresting them or transferring them from one point of the Nation to another, if they do not prefer to leave Argentine territory."

4. The notations A–1, B–1, L–1, etc., refer to the volume of Argentina's submission to this Court in which the cited material can be found.

*ports on Human Rights Practices for 1979* (1980), L–1, doc. XX at 230; *Nunca Mas,* at 32 (case of Mino Retamozo).

### 1. Abduction and Transportation to Secret Detention Centers

The first step in the usual victim's journey was abduction from home or work by a heavily armed group, followed by transportation to a secret detention center. *OAS Report,* at 55; *cf. State Department Report,* at 231 (discussing violations of sanctity of home). Abductions would usually occur very late at night or in the earliest hours of the morning while the victims and their families were asleep. *Nunca Mas,* at 11. The abductors wore civilian clothing, although their status as Army or police personnel was often revealed by their communications with each other and with victims and witnesses. They usually rode in unmarked cars with no license plates. *OAS Report,* at 55.

The abductors either demanded entry or entered the victim's home by force. In nearly all cases, the persons in the dwelling would then have their heads covered so that they were unable to see. The victim and his or her family members were then often subjected to severe beatings while the house was ransacked and any goods of value taken. *Nunca Mas,* at 11, 17, 19. The victim was then bound, blindfolded, placed on the floor of the automobile, and transported to a secret detention center. No arrest warrants were issued and no official reports of the abduction were made. Consequently, habeas corpus inquiries would later be answered in the negative.

If local police happened to arrive they would depart after speaking with the abductors. This occurred because police, who were under Army command, had been instructed to grant the abductors a "free zone." *OAS Report,* at 55; *Nunca Mas,* at 13–14. Likewise, if family members attempted afterward to report the incident to the local police they were rebuffed. Once the victim was abducted and transported, his or her destination was known only to the Army and the agencies under its command. Attempts to locate victims were frustrated not only by lack of police cooperation, but also by the secrecy of the locations of the detention centers. Of those persons abducted in their homes, some 60% have never been seen again. *Nunca Mas,* at 11.

### 2. Torture

The use of torture was also an important element in the Army's "dirty war" strategy.[5] Such torture typically began upon the victim's arrival at the detention center. *State Dep't Report,* at 230. It often continued unabated until the victim was released or killed. According to the 1980 Organization of American States' Report, the methods of torture included, but were not limited to, the following:

a) Brutal beating[s] ... which on several occasions has resulted in broken bones and partial disablement; in the case of pregnant women it has caused miscarriages ... This type of beating is carried out with different kinds of metal, rubber, wooden and other weapons, and with fists and kicks ...

f) The systematic application of the so-called *picana electrica* [cattle prod], whereby the victim is [stripped naked and] tied to the metal parts of the bed and is subjected to currents of high voltage electricity on various parts of the body, such as the head, the temples, the mouth ... the breasts and genitalia; furthermore the body is doused with water so as better to conduct the electrical charges ...

i) The threat or consummation of rape of both women and men.

**5.** Although there is evidence that some of the victims of the present charged offenses were tortured, Suarez–Mason is charged in this proceeding only with specified crimes of murder, kidnapping, and forgery. Whether or not he is responsible for injuries caused by acts of torture is at issue in three civil lawsuits pending in this District. *See Martinez–Baca v. Suarez–Mason,* 87–2057–SC; *Forti & Benchoam v. Suarez–Mason,* 694 F.Supp. 707; *Rapaport v. Suarez–Mason,* 87–2266–JPV.

j) Placing prisoners in pens with vicious dogs trained by the captors, until they are almost dismembered.

*OAS Report*, vol. L–18 (Part Two), at 199–200.

The actual testimony of victims who survived internment in the secret detention centers offers disturbing witness into the tactics and methods of the "dirty war." One reported method of psychological torture was to force victims to watch family members be tortured, raped, or killed. One victim who was abducted with his wife and daughter reports that during a torture session his captors brought in blood-soaked rags which they told him were his wife and daughter's underpants. Later his wife, viciously beaten, was brought into the room for two minutes, then taken away. *Nunca Mas*, at 22–23 (testimony of Dr. Norberto Liwsky). Another victim, Carlos Campero, reports witnessing the following torture of his mother:

> My mother was taken to the shop and, threatening her life, they beat her in a way that should not even be used on wild animals ... They cut the cable, plugged it in and used it to give her electric shocks. So that it would have more effect, they poured mineral water over my mother, whom they had tied to a chair. While they were committing this savagery, another one was hitting her with a belt until her body was bleeding and her face disfigured.

*Id.* at 18.

Almost all victims report severe beatings in their homes or upon arrival, often without any questions being asked. After this initial "softening up," nearly all victims were subjected to electric shocks, *State Dep't Report* at 230, often applied in ways that were terrifyingly creative.[6] The shock torture often caused permanent scarring, disfigurement and disability. Most victims report scarring from severe burns, *id.* at 32, and injury from muscle contraction caused by the shocks.

"Blood was pouring from my mouth, as my muscles contracted during the discharges and I clenched my jaws with my tongue protruding, so that I virtually bit through it."

*Id.* at 40.

Sexual violence was also widely reported. Men report being anally raped, and penetrated with other objects, including steel pipes through which high voltage electric currents were passed while the pipe was inside the victim's anus. *Id.* at 24, 44. Women were subjected to numerous ghastly forms of degradation and sexual abuse. Many female victims, including a seventeen-year-old girl, report being stripped, strapped down, and shocked in the vagina, breasts and anus. Often this treatment caused severe internal vaginal bleeding. *Id.* at 37, 43, 46, 47. In some cases the shock sessions were interspersed with rapes and other forms of torture. One victim reports being kept naked for an extended period during which she was intermittently gang raped, immersed in frigid water, electrically shocked, and forced to parade naked in front of groups of laughing soldiers. She further reports that the soldiers brought in tapes which they told her were of her baby boy crying, and forced her to listen to them while she was being tortured. *Id.* at 48–49.

### 3. Death and Disposal of Bodies

Prisoner homicides occurred either as a result of the infliction of torture, or by deliberate execution. *Nunca Mas*, at 246; *State Dep't Report*, at 230 ("summary execution was a common practice during the years when large numbers of people were being detained by the security forces"). Attempts to cover up these deaths were often made through contrived confrontations between alleged subversives and security forces. *Id.* at 217, 246. Specifically, bogus reports were filed stating that security forces, as they transported prisoners whose detentions had somehow been recorded, were attacked on the highway or

---

**6.** These methods included the "telephone," an electric prod attached simultaneously to the mouth and ears, the "helmet of death," an electrode studded device placed on the victim's head, and electrode studded underwear. *Nunca Mas*, at 29, 32, 36.

elsewhere by gangs of subversives. Remarkably, the attacking subversives as well as the prisoners would die in the shootout while the security forces suffered no injuries. *See generally Nunca Mas*, at 215–221. Once the victims were killed their bodies might be released to their families, disposed of by burial in mass graves, thrown into the river, or abandoned on a street. *Id.* at 221–233.

### 4. End of the Military Regime

By 1979, the Military Commanders claimed victory in the war against subversion. In a statement in May, 1979, Lieutenant General Roberto Viola, a member of the ruling military junta stated:

> This war, like all wars, has a dimension that is different from the value of life. For that reason it is a war. Dams and barriers are broken. Life and death are gambled away in the pursuit of victory. The worst thing is not the loss of life; the worst thing is to lose the war. For that reason, the army, which today has restored the value of life, can say to the country that we have carried out our mission.

*See Argentina's Memorandum*, at 28 (quoting Viola).

Democratic government in Argentina was reestablished under President Raul Alfonsin in 1983. This occurred after Argentina's defeat in the Falklands War had severely discredited the military leadership, and the military regime had been unable to find a long-term solution to Argentina's economic woes. Prior to turning over control of the government, the nine military leaders who had been members of the junta between 1976 and 1983 issued a "Final Document" in which they admitted to the use of "unconventional methods" in the course of the war against subversion. These methods, they contended, were necessary under the circumstances. The junta members took full responsibility for the planning, direction, supervision and execu-

tion of the war. Suarez–Mason was not a member of the military junta.

The Alfonsin government vested the Supreme Council of the Armed Forces with jurisdiction over the prosecution of military commanders. In late 1983 the nine members of the military junta were arrested and prosecuted.[7] Summoned by the Supreme Council in March 1984, Suarez–Mason failed to appear and instead fled the country. In January of 1987 he was arrested in Foster City, California under a provisional arrest warrant issued at the request of the Republic of Argentina.

### B. *Suarez–Mason's Role in The War Against Subversion*

Pursuant to Directives 1/75 and 404/75, the country was broken down into five military zones. In January 1976 Suarez–Mason was designated as head of Zone One, which constituted an area of about seven million people and included the capital city, Buenos Aires. In the Argentinian Army hierarchy, this command responsibility placed him directly below the military junta. By most estimates, somewhere in the range of 5,000 people disappeared in Zone One during Suarez–Mason's tenure as Zone Commander.

In his command capacity, Suarez–Mason was personally responsible for the issuance of secret Operational Order 9/77 ("Continuation of the Offensive Against Subversion during 1977"). *See* Supplemental Vol. L–6 (full text of order); *see also* Vol. L–1, doc. I (partial text of order). This Order set forth in detail the manner and means by which those in his command were to carry out the necessary operations in the fight against subversion. The emphasis of Argentina's argument is that "the command structure mandated by Operational Order 9/77 was used at least in part to effect the illegal and secret war against alleged subversives within Zone 1." *Argentina's Memo.*, at 32.

Order 9/77, several hundred pages in length, is a comprehensive set of directives which regulates in minute detail virtually

---

7. In December of 1986 the Alfonsin government enacted the "punta finale" (due obedience), absolving from liability the lower level military personnel who committed crimes on the orders of superior officers.

every aspect of operations in Zone One. With the thoroughness of a legal code, the order issues instructions pertaining to order of battle, jurisdiction, intelligence, execution of targets, communications, legal bases, personnel, logistics, civilian matters, finance, security, functions of police operatives, security for sporting activities, electronics and reports. Several aspects of the Order are of particular note.

*First,* Annex 4 (Execution of Targets), states that: "Zone 1 will continue to carry out the investigative and detention procedures referring to raids, in their jurisdiction, to detect and detain subversive elements in order to achieve their annihilation." L–1, doc. I at 123. The order distinguishes between two categories of "targets"—"pre-established" and "chance." Because chance targets "will normally be fleeting by nature, [the raid] should be carried out as quickly as possible." *Id.*

Perhaps most importantly, the order is unequivocal in its command that the selection of targets and the authorization for raids must come directly from the Zone One Command via the procedures adopted in the Order. It also requires a report to the Command by the operatives within 24 hours after completion of the operation. *Id.* at 125. While the Order does not state criteria for target selection, it does contain the following passage: "[W]hoever sympathizes or collaborates with the subversion exposes himself knowingly to the same risks as the members of the subversive gangs." Supp. vol. L–6, tab A–2, at 101.[8]

*Second,* Order 9/77 specifically directs that the Navy, Air Force and police agencies are to come under the Zone One Command's authority and may be integrated fully into "operations" by the subzone commanders. L–1, doc. I at 114, 133, 136–37. *See also* doc. I at 109. Further, it mandates that once the command has given authorization to act, the area in which the target is located shall be considered by the subzone as a "free area" for a three hour period. *Id.* at 127 ("[T]he subzone will

consider as a 'free area' the ... quadrant and block corresponding to the place where the operation will take place."). The Order then elaborates procedures for pursuit of targets, etc., clarifying that virtually all actions were to be authorized by the Zone One Command. *Id.* at 128–130.

*Third,* the order provides a *"Procedure With Minors Abandoned as A Result of Anti–Subversive Operations."* L–6, tab A–3, at 15. With children of up to ten years of age the "commandos" were directed as follows: "In cases where the relationship of the children to detainees *or 'disappeared persons'* is known, the organ which is responsible will deliver the children to the nearest relatives." *Id.* (emphasis added).

In addition to Order 9/77, Argentina stresses the heavily documented fact that Suarez–Mason directed the establishment of, and administered approximately 20 secret detention centers in Zone One. *See* L–20 (statements of General Montes, Ferraro, Gamen and Colonels Roualdes and Ferro); L–1, doc. R (statement of General Ojeda). There is evidence that most of the victims of the present charged offenses were taken to one or more of these detention centers. Moreover, Suarez–Mason gave direct orders for detentions, including those of members of the "Chavanne Group" for whose kidnappings extradition is sought. *See, e.g.,* L–2, docs. S at 66–68; Z at 85; CC at 88 (statements of Colonel Roualdes). *See also* L–1, doc. P (discussing detention of Jacobo Timerman, editor of "La Opinion"). The kidnappings were carried out secretly. Verbal, not written orders were given; the victims were blindfolded and abducted late at night or early in the morning; no warrants or other authorizations were sought and the military denied knowledge of the victims' whereabouts.

Finally, Argentina presents evidence of Suarez–Mason's knowledge of deaths in the testimony of witnesses to a conversation between Suarez–Mason and a police offi-

---

**8.** The pages in Supp. vol. L–6 are not numbered. The cited passage occurs 101 pages after tab A–2.

cial. According to witnesses, Suarez–Mason severely reproached the official for not informing him that the remains of a prominent disappeared person had surfaced in the river. L–1, docs. V & W. The police chief then reportedly said: "My general, why are you reproaching me when they have thrown 8,000 people into the river in my jurisdiction?" *Id.*, doc. W at 163. While the meaning of "they" is ambiguous, the chief reportedly went on to say "how am I going to identify so many people if you have thrown about eight thousand people on me." *Id.* [9]

This evidence is cited by Argentina to establish Suarez–Mason's "hegemonic" control of the Zone One Command. *See, e.g.,* L–20, at 17 (statement of General Ferraro). Specific evidence relating to the factual circumstances of each of the charged offenses has also been submitted. Argentina contends that this evidence demonstrates that: (1) the offenders were members of the Zone One Command; (2) the offenses were in fact carried out within the disciplined framework established by Suarez–Mason's orders; and, as a result, were carried out under his direction and control. The evidence offered will be discussed in relation to each of the separate charges.

### C. *Crimes Charged*

Argentina seeks to extradite Suarez–Mason for the following offenses:

(1) The homicides of 43 individuals, allegedly by persons acting under the command of the First Army, during the period of May 1976 to August 1978, while Suarez–Mason was head of the Zone One Command.

(2) The kidnapping and sustained detentions of Juan Chavanne and 22 of his associates in the course of an Army investigation into Chavanne's alleged role in financing a subversive organization.

The kidnap and detention of Alfredo Giorgi (who has not been seen since December 31, 1978).

(3) The forgery of a passport in 1985, pursuant to Suarez–Mason's successful effort to flee Argentina.

Suarez–Mason is not charged with personally committing either the homicides or the kidnaps. Rather, he is charged as a principal who directed and controlled the acts of murder and kidnapping in that (1) Suarez–Mason was the Commander of the First Army; (2) the charged offenses were committed pursuant to a system of secret verbal orders controlling conduct of members of the First Army Command; and that therefore, (3) the "inescapable inference is that these orders were given by Suarez Mason, and contemplated the wholesale [offenses] previously described." *Argentina's Memorandum,* at 62.

### II.

In order to extradite Suarez–Mason on the murder, kidnap, and forgery charges, Argentina must establish six elements:

(1) that there is an extradition treaty in force between the U.S. and Argentina;

(2) that there are criminal charges pending in Argentina against Suarez–Mason;

(3) that the crimes for which he is charged are extraditable crimes within the terms of the treaty;

(4) that the individual before this Court is the same person who is charged in Argentina;

(5) that the evidence submitted establishes probable cause to believe that Suarez–Mason committed the charged offenses; and

(6) that the alleged offenses are criminal in both Argentina and the U.S.A.

*See, e.g., Extradition of Kraiselburd,* 786 F.2d 1395, 1399 (9th Cir.1986) (elements 1–5); *Caplan v. Vokes,* 649 F.2d 1336, 1343 (9th Cir.1981) (element 6).

The Court finds that the submission of the Republic of Argentina establishes elements (1)–(4) and (6). Suarez–Mason does

---

**9.** In addition to bodies which surfaced in the river, unearthing of graves in the Zone One Command has revealed approximately 1,000 unidentified bodies buried between 1976 and 1979.

Most of these persons died of bullet wounds and the deaths were not reported. *See* L–22 (report of pathologist Clyde Snow).

not dispute this finding.[10] Thus, the discussion relative to the specific offenses charged will focus on the question of probable cause. In addition, under the "doctrine of specialty" this Court must make a determination as to *each* of the charged offenses, and Argentina may prosecute Suarez–Mason only on those offenses for which the Court finds all the elements have been satisfied. *See, e.g., United States v. Rauscher*, 119 U.S. 407, 420–21, 7 S.Ct. 234, 240–41, 30 L.Ed. 425 (1886); *Quinn v. Robinson*, 783 F.2d 776, 783 (9th Cir.1986).

Article Five of the treaty provides as follows:

Extradition shall be granted if the evidence presented, according to the laws of the place where the indicted or convicted person is located, would justify his arrest in order to be held for trial if he had committed the crime there ...

*Treaty*, art. 5, in vol. A–1.

United States courts have interpreted treaty provisions such as this to require a showing by the requesting party that there is probable cause to believe that the accused has committed the charged offense. *See, e.g., Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911); *Quinn v. Robinson*, 783 F.2d 776, 783 (9th Cir.1986). The probable cause standard applied in extradition proceedings is defined in accordance with federal law and has been described as "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir.1984) (quoting *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C.Cir. 1973)). It is with this standard in mind that the Court will examine the evidence presented by Argentina.

### III.

■ An initial matter which the Court must address is whether extradition on any of the present charges is barred by the statute of limitations. The treaty forbids extradition on charges for which prosecution is barred "by lapse of time according to the laws of the requested party or the requesting party." *See Treaty*, art. 7(1)(c). Suarez–Mason contends that all the charged offenses must have been committed during his tenure as First Army Commander, which ended on February 18, 1979. He argues that the five year statute of limitations in 18 U.S.C. § 3282 is applicable and that therefore the charges (which were not filed until late 1984 and mid 1986) are time-barred. *See Opposition*, at 13–14.

Suarez–Mason's argument neglects two important points. *First*, 18 U.S.C. § 3281, not § 3282, is applicable to homicide charges. *See, e.g., Extradition of Kraiselburd*, 786 F.2d 1395, 1397–98 (9th Cir.1986). Section 3281 provides no time limit for prosecution. *Second*, the forgery charge concerns events which occurred in 1985, not 1976–79. Therefore, the statute of limitations argument is without merit in regard to the homicide and forgery charges, but the issue must be considered in relation to the kidnapping charges.

■ In determining what United States statute of limitations is applicable, this Court looks to the substantive offense under United States law which is most closely analogous to the charged offenses, and applies the statute of limitations applicable to that offense. Suarez–Mason is charged with 24 counts of Unlawful Deprivation of Freedom in violation of Argentine Penal Code §§ 142(ii) and 144. Argentina initially argued that the federal kidnapping statute, 18 U.S.C. § 1201, is not analogous to the charged offenses and that the Court should therefore look to California Penal Code § 209. However, at oral argument Mr. Zanides conceded that the federal statute covers the charged conduct.[11]

---

**10.** Suarez–Mason does contend that element (6) cannot be established as to the kidnaping charges. This contention is discussed *infra* note 12.

**11.** Absent this concession, the Court would still conclude that § 1201 is analogous to the Argen-

tine Penal Code provisions under which Suarez–Mason is charged. Argentina's original theory appeared to be that Suarez–Mason abducted the victims to extort *information*, as opposed to "ransom or reward," and that such a motivation is not covered by the federal statute.

■ Argentina appears to recognize that application of the federal statute of limitations would bar extradition on these charges, and thus emphasizes the principle that in extradition proceedings "a technical non-compliance with some formality of criminal procedure should not be allowed to stand in the way of a faithful discharge of our obligations." *Grin v. Shine*, 187 U.S. 181, 184–85, 23 S.Ct. 98, 99–100, 47 L.Ed. 130 (1902); *see also Factor v. Laubenheimer*, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933). Argentina argues that application of the federal provision would frustrate the purposes of the treaty and that the Court should therefore apply the principle of *Grin* and *Factor* to hold that the California statute is applicable. The cited cases are inapposite, however, in that they deal with general procedural issues not covered in the treaty. In this case, however, the statute of limitations is defined by an explicit provision of the treaty. Article 7(1)(c) directs that extradition is forbidden on charges for which prosecution is time-barred "by lapse of time according to the laws of the requested party or the requesting party." The United States, not California, is the requested party. To hold otherwise would directly contravene the treaty's explicit language. Moreover, the Ninth Circuit has stated explicitly that where a federal substantive statute is analogous to the charged conduct it is to be applied ahead of a state statute. *See, e.g., Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir.1981).

■ Both *Cucuzzella* and the explicit terms of the present treaty direct this Court to apply the federal substantive statute, 18 U.S.C. § 1201, and the corresponding federal statute of limitations, 18 U.S.C. § 3282. The kidnapping offenses involved here were complete by January of 1979. The charges were filed in December 1984, well over five years later. Argentina has presented no argument that the statute was tolled at any time. Therefore, extradition on these charges is time-barred by the five year limitations period of § 3282.[12]

## IV.

### The Homicides

■ Suarez–Mason is charged with 43 counts of homicide in violation of Articles 79 and 80, as well as Article 45 [13], of the Argentine Penal Code. *See* L–17 (text of homicide statutes). Argentina contends that its submission establishes that these homicides were carried out in a fashion consistent with the system of command established by Suarez–Mason in Operational Order 9/77, and that "each of his subor-

However, the Federal statute specifically prohibits kidnapping or abduction "for ransom or reward or *otherwise.*" 18 U.S.C. § 1201 (emphasis added). The California statute prohibits kidnapping or abduction "for ransom, reward or to commit extortion." CAL. PENAL CODE § 209. In the Court's view, the use of the word "otherwise" in the Federal statute includes an attempt to extort information.

12. Suarez–Mason does argue that the dual criminality requirement of element (6) cannot be established in relation to the kidnapping charges. *See, Opposition,* at 15–29; *Supplemental Opposition,* at 45–57. Because the Court finds that these charges are barred by the statute of limitations it does not reach the dual criminality question. However, the Court will note that but for this bar, these charges would be extraditable as they are legally and factually valid. The submitted evidence establishes that Suarez–Mason ordered the charged detentions of the Chavanne group. Colonel Roualdes specifically testified that Suarez–Mason issued all the detention orders for the 23 members of the Chavanne group. *See, e.g.,* L–2, docs. S at 66–68; Z at 85; CC at 88. Other witnesses, both Army personnel and detainees, corroborate Suarez–Mason's "strict" control of the investigation. *Id.,* docs. F at 29; V at 79; M at 51–52.

Argentina has also established probable cause to believe that Suarez–Mason ordered the detention of Alfredo Giorgi. It is clear from the testimony of numerous witnesses that Alfredo Giorgi was detained and tortured at the "El Olimpo" detention center. L–3, docs. I, J, K, L, M, N, O. One of the witnesses reports speaking with Suarez–Mason twice at el Olimpo. *Id.,* doc. L. There is also considerable evidence that Suarez–Mason directly controlled issuance of detention orders, and that he personally administered the detention centers. *See* L–20 at 2–6 (general Montes); 11–17 (General Ferraro); 22–25 (Colonel Ferro). *See also* L–1, docs X at 168–69; DD at 177; EE at 182; GG at 188; PP at 202–03.

13. Article 45 provides that one who aids in the commission of an offense, or instigates another to commit it is subject to the same penalty as the actual perpetrator.

dinates who was questioned by the Federal Court of Appeals testified [that] their acts were committed while following orders. The inescapable inference is that these orders were given by Suarez Mason, and contemplated the wholesale murders previously described." *Argentina's Memo*, p. 62.

Argentina's argument focuses on several common characteristics of many of the homicides: (1) victim abducted by heavily armed persons, usually identified as police or Army personnel; (2) victim seen at detention centers run by Suarez–Mason; (3) victim killed by gunshots, often to the head; and (4) official refusals to respond to inquiries about the victim's disappearance. *See Argentina's Memo*, at 64–80; *Argentina's Reply*, at 29–46. Suarez–Mason contends that Argentina's assertion is really that "because deaths presumably did occur, they *must* have occurred in conformance with [Suarez–Mason's] orders." *Opposition*, at 37 (emphasis in original).

The Court will separately consider the evidence presented in relation to each of the charged homicides. Nevertheless, before doing so certain general observations are in order. Initially, the Court concludes that where Argentina establishes that a particular offense was committed by persons under Suarez–Mason's command, and the circumstances of the offense support the conclusion that they were acting pursuant to the directions of the system put in place by Suarez–Mason, such a showing will generally be sufficient to satisfy the probable cause threshold. There are several reasons for this conclusion.

*First,* Order 9/77 mandated that the selection of targets was to be handled *directly* by the Zone One Command, and that raids could be conducted *only* after the Command had given authority to act. Moreover, the Order established a systematic method for the carrying out of operations which is entirely consistent with the method described in *Nunca Mas*, and in which most of the present homicide victims were abducted. While the target selection process did not specifically state that targets would be abducted and killed, the pro-

vision for dealing with young children of "disappeared persons" strongly supports the inference that this was an intended result of the raids. It therefore appears that the present homicides were part of an organized scheme or "battle plan" emanating from the Zone One Command.

*Second,* the comprehensive nature and extraordinary detail of Order 9/77 leaves little question that Suarez–Mason was a "hands-on" commander who directly controlled the operations under his command. This characterization is buttressed by the statements of Generals Montes, Ferraro and Gamen, and Colonels Roualdes and Ferro. *See* L–20. General Ferraro describes Suarez–Mason's authority as "hegemonic." *Id.* at 16. Suarez–Mason "directed all the elements under him very directly and personally; he never at any time ... delegated responsibilities nor at any time did he permit people who were under him to assume any one of the duties attributed to himself." *Id.*

*Third,* the evidence shows that Suarez–Mason directly and personally controlled the detention centers at which most of the present homicide victims were held. Suarez–Mason's control of the centers is borne out by the testimony of the above mentioned officers. *See* L–20 at 2–6 (General Montes); 11–17 (General Ferraro); 22–25 (Colonel Ferro); L–1, doc. R (General Ojeda). It is also corroborated by witnesses, including both detainees and gendarmerie, who saw Suarez–Mason on numerous occasions at different detention centers. *See* L–1, docs. X at 168–69 (Falcone); DD at 177 (Torres); EE at 182 (Guillen); GG at 188 (Acosta); PP at 202–03 (Alfaro). One witness reports Suarez–Mason described as "the Boss." *Id.*, doc. PP at 202. Two witnesses report many of the tortures described earlier were practiced at these camps. *Id.* at 203; DD at 177–78.

*Fourth,* the massive scale on which offenses were committed creates a strong inference of Suarez–Mason's authorization. Human rights violations in Argentina created international outrage by the late 1970's, and resulted in economic sanctions by President Carter. *Nunca Mas*, at xiv

(Introduction by Ronald Dworkin). The Court thinks it highly improbable that any commander, let alone one with Suarez–Mason's demonstrated attention to detail, could be unaware of such massive violations occurring under his nose. Nevertheless, in several of the present cases Suarez–Mason ordered investigations of victims' deaths in alleged confrontations closed, despite the fact that the circumstances of these "confrontations" were so improbable that any reasonable person should immediately have suspected that they were staged. *See* homicides discussed in Volumes L–8, *infra* pgs. 693–94; L–10, *infra* pgs. 695–696; L–14, *infra* pgs. 700–01.

The Court reviews the evidence in this hearing not to determine ultimate guilt, but to determine probable cause. Where Argentina establishes that the offenses were committed by persons commanded by Suarez–Mason, acting within the framework he established, the Court thinks such evidence generally sufficient "to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir.1984) (quoting *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C.Cir.1973)).

Given the great volume of evidence in this proceeding, the Court will not offer a comprehensive recitation of the evidence relative to each charge. Rather, some of the charges will be discussed in detail to illustrate the pattern of conduct, while other charges will be addressed in a more summary fashion.

1.  *Volume L–4* (Homicides of Zelmar Michellini, Hector Jose Gutierrez Ruiz, William Whitelaw, and Rosario del Carmen Barredo de Schroeder)

    a.  *Facts* [14]

    ■  The bodies of the four victims discussed in Volume L–4 were found together in a parked car on May 21, 1976. All four had been killed by gunshots to the head.

## ZELMAR MICHELLINI

On May 18, 1976 at approximately five o'clock a.m., 12 individuals armed with rifles and pistols abducted the victim from his residence suite at the Hotel Liberti. These individuals wore unmarked jackets and were seen driving "a white Chevy, an olive green Falcon, and a white Torino." L–4, doc. A, at 1. Upon entering the hotel they approached the desk clerk and demanded the key to the victim's suite. According to two witnesses, a man who appeared to be the ringleader stated that "this is a Navy operation." *Id.*, docs. A at 1, B at 3.

When the concierge asked the leader for identification he showed his weapon and stated "this is our identification. We are at war against Marxism, when we kill nobody is identified." This same witness states that "from their lively voices they appeared to belong to some military or police force." *Id.* at 3–4. The clerk handed over the key and some of the individuals proceeded to the victim's suite. Upon entering the suite the abductors threatened the victim's sons and blindfolded him. They then proceeded downstairs and took him away.

Upon request of the victim's son, the hotel concierge proceeded immediately to the police station to attempt to file a report. He returned and told the son that the police "did not want to register the complaint seeing that this was a case of anti-subversive proceedings." *Id.* On May 21 the victim's body was found in a car with those of the three other victims discussed in L–4. The cause of death was a bullet wound to the head. *Id.*, doc. P at 44, S at 59.

---

**14.** The evidence contained in Volume L–4 includes documents A (Eduardo Michellini deposition); B (Nelson LaBerthe deposition); C (Mario Pracacci deposition); D (Roberto R. Agostini deposition); E (Matilde Rodriguez de Gutierrez Ruiz deposition); F (Miguel Angel Ferreyra deposition); G (Ricardo Zanetti statement); H (Eduardo Rodriguez statement); I (Raul Antuna statement); J (Margerita Michellini Della Piane deposition); K (Juan R.F. Sienra declaration); L (Alfredo Urrizola statement); M, N (police documents; O, P, Q, R (autopsy reports); and S (death certificates).

## HECTOR JOSE GUTIERREZ RUIZ

On May 18, 1976 at approximately two o'clock a.m., several heavily armed men in casual clothes, including some in army fatigues entered the victim's apartment building at 1011 Posadas Street in Buenos Aires. They awakened the building superintendent, Mr. Verreyra, showed him Federal Police identification, and asked him whether the victim lived in the "A" quarter apartment. L–4, doc. F at 13, 18. The superintendent answered them in the affirmative, and was told to prop open the door onto Posadas Street and return to his apartment. Id. Mr. Verreyra adds that he saw "a parked car, white Torino, without patent, with some persons inside." Id., at 19.

The victim's wife testified that the men then entered the apartment (which she shared with her husband and their five children) by breaking down the door. They then demanded her husband's name, which he gave them. He was immediately bound to a chair with his hands behind his back and a burlap sack was placed over his head. Id., doc. E at 8. Mrs. Gutierrez Ruiz was restrained by two men while others ransacked the house, filling seven of the family's suitcases with the family's belongings and passing them down to their accomplices in the street. She saw that the abductors drove two or three cars which she thought were white in color.

As the victim was being taken out, he told his wife several names of people she could call, including Zelmar Michellini. When Michellini's name was mentioned one of the abductors said: "We are also to take that communist away as well." Id. at 9. Thereafter, the leader of the group informed Mrs. Gutierrez Ruiz that she would have to accompany them to make a statement. When she refused, she was told that her husband would be killed. She then asked: "Do the police kill?" The leader replied, "yes they kill." Id. At this point her six and nine year old children began to cry and the abductors exited.

Mrs. Gutierrez Ruiz made several attempts to file reports of the kidnapping and robbery, but the police refused to take them. Id., doc. E at 9, 12. She remembers speaking with a journalist named Julio Traisel who had ties to the Argentine government. Traisel informed her that her husband and Michellini were being held in a military camp. Id., at 9. On May 21, the victim's body was found in an abandoned car with those of Michellini and the two other victims discussed in Volume L–4. The cause of death was a bullet wound to the head. Id., doc Q at 50, S at 57.

## WILLIAM WHITELAW and ROSARIO DEL CARMEN BARREDO DE SCHROEDER

The bodies of this married couple were also found with those of Michellini and Gutierrez Ruiz on May 21. According to the testimony of a neighbor, Ricardo Zanetti, he saw the couple being taken away from their home by three armed persons who got into a white Torino. L–4, doc. G at 21. Another neighbor, Eduardo Domingo Rodriguez, reports being questioned by several persons who were ransacking the victims' home at the time. He reports being told that "these people killed two comrades of ours and are extremists." Id., doc. H at 22.

### b. *Finding Re: Probable Cause*

The Court concludes that Argentina has shown probable cause in relation to the four charged homicides. The abductors of Gutierrez–Ruiz identified themselves as and showed credentials of the Federal Police. At the time of the abductions they were under Suarez–Mason's command, and Order 9/77 explicitly directed that they be "integrated" into operations. In addition, the refusal of local police to take reports of the abductions supports the conclusion that they had been instructed to grant a "free zone."

Moreover, there is significant evidence to support the inference that Michellini's abductors carried out the raids on the other three victims. The abductions were carried out in a similar manner: heavily armed persons entered the home, ransacked it, blindfolded the occupants, and took the victim(s) out. A white Torino was seen at the scene of each of the abductions. During the abduction of Gutierrez Ruiz, one of the operatives made a specific reference to

their intention to "take away that communist" Michellini. Three hours later, Michellini was abducted. Finally, all four victims were found together, executed by gunshots to the head.

In light of Order 9/77 and the other evidence of Suarez–Mason's direct control, Argentina's showing is sufficient to support the conclusion that the "targets" were executed pursuant to the Order of the Zone One Commander, Suarez–Mason. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States on the homicides of the four above-named victims.

2. *Volume L–5* (Homicides of Gabriel Eduardo Dunayevich, Federico Martul, and Letitia Mabel Akselman)

a. *Facts*

The bodies of the three victims discussed in Volume L–5 were buried together in an open field near the Del Viso Cemetery. All three had been killed by bullet wounds to the head.

On May 29, 1976, eighteen-year-old Gabriel Eduardo Dunayevich was abducted by a group of five or six heavily armed uniformed police on a Buenos Aires street. L–5, doc A at 1. His mother and another witness saw him early the next month at a secret detention center located at a farmhouse of undetermined location. *Id.*, doc. C at 3, J at 13–14.

Federico Martul, age 17, was abducted by several armed men on June 23, 1976 at 4:45 A.M. The abductors wore civilian clothing, but said they were from the Army although they did not show identification. *Id.*, doc. E at 5. The witness at the above-mentioned secret detention center reports that a boy named Federico was held there and was taken away with Dunayevich and two others.

Nineteen-year-old Letitia Mabel Akselman disappeared on her way to visit a friend on June 12, 1976. Akselman's parents received word of a rumor that their daughter was being detained by the government and presented a habeas petition for her release as well as filing reports with other agencies. These efforts were fruitless. The bodies of Dunayevich, Martul and Akselman were later discovered after having been buried together. *Id.*, docs. E at 5, O at 22, P at 31. All three victims died of bullet wounds to the head. *Id.*, docs M & P.

b. *Finding re: Probable Cause*

Several factors lead the Court to conclude that Argentina has shown probable cause in relation to the three homicides: (1) the method of abduction is consistent with others carried out by Suarez–Mason's troops; (2) the abductors of Martul identified themselves as members of the Army; (3) both Martul and Dunayevich were seen at secret detention centers; (4) the lack of response to Akselman's mother's habeas petition is consistent with the experience of other persons petitioning for release of Zone One detainees; and (5) the victims were executed by gunshots to the head, as were other victims of the Army in Zone One.

The evidence of Suarez–Mason's personal control of the secret detention centers is unequivocal. In light of this fact, as well as Order 9/77 and the evidence cited above, Argentina's showing is sufficient to support the conclusion that the homicides were carried out pursuant to the directive of the Zone One Commander, Suarez–Mason. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States on the homicides of the three above-named victims.

3. *Volume L–6* (Homicide of Jacobo Chester)

a. *Facts*

Jacobo Chester was abducted from his home in the early morning hours of November 26, 1976 by armed Zone One Army personnel. The abductors, including a Colonel NiCastro, were positively identified as Army personnel by the victim's wife and daughter, who had seen them conducting an investigation of the alleged circulation of subversive literature at the hospital where the victim worked. L–6, docs. A & B. Several hospital security personnel report hearing that early morning kidnap-

pings were carried out. *Id.*, docs. D, E, F, G. None of these witnesses testifies to personal knowledge of either the Chester kidnapping or any murders, although one did report hearing members of the security team report that "we blew another one up," and "so-and-so we have to give him the ticket." *Id.*, doc. E at 11.

In the course of the abduction the victim, his wife, and their twelve-year-old daughter were severely beaten while being questioned about having passed out pamphlets for the "ERP" and the "Monteneros." (Two active terrorist groups). The twelve-year-old child reports being taken into a separate room and punched, slapped and beaten for 30 to 40 minutes while she was questioned about Montenero pamphleteering. When the abductors ransacked the house and found Hebrew texts she was questioned about them, and was then beaten and scratched with the sharp end of a broken hangar. While the translation is not entirely clear, it appears that she was also sexually assaulted. She reports that "another person took me from the bed and put me up against the wall. They penetrated me (but) I can't say with what because I was blindfolded and tied. I asked where my parents were. He said I could go look for my father in the ditches." *Id.*, doc. B at 6.

The victim's wife and daughter made numerous attempts to file habeas petitions, but were told by officers at several police stations that these officers had no jurisdiction. *Id.*, docs. A & B. An unidentified male body was found in the Rio de la Plata waters on December 2, 1976. It was nude, all the ribs had been broken, the feet were bound and some sort of rope was found hanging about the neck. *Id.*, doc. I. The body was later identified as that of Jacobo Chester. *Id.*, doc. J.

### b. *Finding re: Probable Cause*

Argentina has shown probable cause in relation to the homicide of Jacobo Chester. His abductors were positively identified as Army personnel, and he was savagely beaten and killed after being taken into custody. The refusal of local police to file the family's complaints supports the inference

that a "free zone," similar to that discussed in Order 9/77, had been granted. Moreover, the body was thrown in the river. Suarez–Mason's conversation with the local police official, *see supra* pp. 684–85, establishes that he was aware of this practice, and the police official's statement that Suarez–Mason had "thrown" so many bodies on him supports the assertion that Suarez–Mason authorized the practice.

In light of Order 9/77 and the evidence establishing Suarez–Mason's personal participation in the process of target selection, Argentina's showing is sufficient to establish probable cause to believe the homicide was carried out on the order of the Zone Commander. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States on the homicide of Jacobo Chester.

4. *Volume L–7* (Homicides of Dardo Cabo, Roberto Rufino Priles, Ana Maria Perdighe, Victorio Perdighe and two unidentified victims).

### a. *Facts*

Dardo Cabo and Roberto Priles, prisoners in the custody of the Zone One Command, were killed on January 15, 1977, reportedly while being transferred between two detention facilities on the order of the First Army. According to the official report filed with the subzone chief, the transfer escort was "ambushed by subversive elements, that drove about 10 trucks," and during an exchange of gunfire "the two detainees were hit by bullets and died instantly." L–7, doc. B at 16. The report does not attempt to describe any of the subversive attackers. It notes that none of the government forces were killed, although five were allegedly injured. No names of, or descriptions of the injuries to, the officers is included. *Id.*

The autopsy reports determined that Cabo and Priles died of "massive brain destruction" and "cerebral destruction." *Id.*, doc. H at 18, 19. The report to the subzone chief states that four of the other persons carrying out the ambush were also killed. Two of these persons were later identified as Victorio and Ana Maria Pe-

rdighe, a brother and sister who had disappeared in September and December of 1976. *Id.*, doc. E. Their mother had filed a habeas petition but never received any response. *Id.*, doc. E. The autopsy reports show that both the Perdighes and the still unidentified victims all died of "massive cerebral destruction." *Id.*, doc. H at 20–22, 24.

b. *Finding re: Probable Cause*

Argentina has established probable cause in relation to these six homicides. The report of a "confrontation" is patently unbelievable; for the report to be believed one would have to conclude that the troops managed to shoot four attacking subversives *all in the head,* while the attackers failed to hit a single troop but did somehow manage to kill their two cohorts instantly with stray bullets. The fact that the victims all died of gunshots to the head supports the conclusion that they were executed and that the confrontation was staged. There is no dispute that the troops who did the killing were under Suarez–Mason's command.

Argentina's showing is sufficient to establish probable cause to believe that the executions were carried out with the approval of the Zone One Commander. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States on the homicides of the six victims discussed above.

5. *Volume L–8* (Homicide of Claudio Edelmiro Ruival)

a. *Facts*

On January 17, 1977 at approximately 3:30 a.m., heavily armed persons identifying themselves as the Argentinian Army entered the home of Beatriz Boves de Marandet and began questioning her daughter, Adriana Marandet, and son-in-law, Claudio Edelmiro Ruival. L–8, doc. A. In the course of the interrogation Ms. de Marandet and her younger children, who were being held in an adjoining room, heard shots fired. A neighbor reported seeing armed persons taking the body of Claudio out of the house later that morning. *Id.*, doc. C at 7. A second witness, Monica

Marisa Cordoba, recalls being placed in a detention center cell with Adriana Marandet. When Cordoba asked Adriana why her pants were bloody, she replied that it was because her husband had been killed. *Id.*, doc. G at 12.

The autopsy report shows that Ruival died of bullet wounds to the chest and neck. According to the joint forces report, he was killed after firing on the Army and police personnel. *Id.*, doc I. However, a subsequent forensic examination revealed *no* gunpowder marks on either of the victim's hands. *Id.*, doc. J at 17. Moreover, the joint forces report is inconsistent with the testimony of both family members and neighbors. In spite of these discrepancies, Suarez–Mason personally ordered that the investigation of the killing be closed, without the taking of witnesses' or participants' statements. *Id.*, doc. L at 21.

Although the killing occurred on January 17, the victim's mother was not officially informed of his death until April 21 when she was told to pick up his body at First Army headquarters. *Id.*, doc. F at 11. The victim's mother-in-law had filed habeas petitions in February and March, both of which had been refused. *Id.*, doc. A at 3. Adriana Marandet remains disappeared to this day.

b. *Finding re: Probable Cause*

There is no dispute that Ruival was killed by troops under Suarez–Mason's command. The testimony of witnesses, as well as the forensic report showing no gunpowder on the victim's hands, render the official report of a confrontation highly suspect. Nevertheless, Suarez–Mason closed the investigation summarily. This evidence is sufficient to establish probable cause to believe Suarez–Mason authorized the killing. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States for the homicide of Claudio Edelmiro Ruival.

6. *Volume L–9* (Homicide of Mario Lerner)

a. *Facts*

At approximately 9:15 p.m. on March 17, 1977 a large group of combined Army per-

sonnel and Federal police, heavily armed and wearing civilian clothing, surrounded the building lived in by 26–year–old Mario Lerner in Buenos Aires. A police official testified that they were responding to a report that a "Montenero" gathering was about to occur there. L–9, doc. O at 59.

According to numerous witnesses, the joint forces fired into and then entered Lerner's apartment. *Id.*, docs. A–F. Lerner was apparently wounded on a patio overlooking the building's internal courtyard. It appears that he was then thrown down into the courtyard. While he was bleeding profusely but still alive, the joint forces dragged him across the building's courtyard, put him into an automobile trunk and drove away. *Id.*, doc. D. Thereafter, uniformed troops and a marked police vehicle arrived on the scene. *Id.*, doc. F.

According to the police report, Lerner had attacked the joint forces by firing two shots from a .22 caliber handgun which was found on his body. *Id.*, doc. J at 49. The building superintendent, Salvador Ludica, reports that he heard two "single shots, like from a pistol or revolver," in the garden area where Lerner was wounded. *Id.*, doc. C at 12. He also reports that these shots sounded different from the others that were fired.

However, Ludica also reports being told by an officer at the scene "to declare that the boy ... had a gun in hand, if not there would be [illegible word] for me also." *Id.*, at 13. In addition, another witness testified that he saw Lerner's fiancee, Maria del Carman Reyes, at a detention center. The witness states that a detention center guard told him that Reyes had given up Lerner's address, and that he had thereafter been "murdered." *Id.*, doc. K at 52.

Lerner's father went to several police stations early on the 18th, and was finally informed that his son was dead. The death certificate reports that he died of a gunshot wound to the abdomen. *Id.*, doc. H at 11. When the father attempted to remove the body from the morgue he was told that he would need an authorization from the First Army Corps. *Id.*, doc. G at 39.

### b. *Finding re: Probable Cause*

While the question in this instance is somewhat closer than in those previously addressed, the Court finds that Argentina has shown probable cause to believe that Lerner's homicide was authorized by Suarez–Mason. On the one hand, there is evidence to support the characterization of his shooting death as being an Army response to armed aggression. The incident occurred earlier in the evening than most of the planned abduction/murders, and there is testimony to the effect that Lerner may have fired shots on the troops.

Nevertheless, the preponderance of the evidence supports the conclusion that the troops either went to Lerner's apartment with a pre-ordained intention to kill him, or decided to kill him once they were there. Given Suarez–Mason's strict control of the "raids" process, requiring contact with the Zone Command even while in pursuit of a fleeing target (L–1, doc. I at 128–30), it is highly likely that such authorization came from him. The fact that while Lerner was mortally wounded the troops threw him from a balcony, dragged him across a courtyard, and tossed him into a car trunk strongly suggests an intention to bring about his death. Moreover, there is no indication that he was given any medical treatment for his wounds.

The testimony of Ludica that he was threatened with reprisals if he did not say Lerner was armed, as well as another witness' testimony that a detention center guard told him Lerner had been "murdered," also support the characterization of this incident as a pre-arranged killing carried out on the orders of the Zone One Command. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States on the homicide of Mario Lerner.

7. *Volume L–10* (Homicides of Norberto Gomez, Elena Kalaidjian, and two unidentified victims).

#### a. *Facts*

Norberto Gomez, a young physician, disappeared between November 13 and 14,

1976. His father later received two letters from him, stating that he was being detained and would be free in a "maximum two years for sure." L–10, doc. X. His father filed a habeas petition but received no response. Numerous witnesses reported seeing Gomez at "El Atletico" detention center where he was being used to treat detainees who were injured in torture sessions. *Id.*, docs. E, F, H, I, J, K, P. Gomez told one detainee, Nelida Simonelli, that part of his job was to "provid[e] a report to an Army physician regarding the physical status of prisoners to bear torture." *Id.*, doc. K at 15.

Elena Kalaidjian disappeared on her way to a friend's house on January 21, 1977. A witness, Elina Celina Zavola de Colautti, reports that she spoke with Kalaidjian at a detention center run by the joint forces. *Id.*, doc. L at 16. According to this witness: "Elena Kalaidjian told me that she had been tortured with electric shocks many times and ... they had set a dog loose and it bit her all over her body." *Id.* Two witnesses also report that a girl who fit Kalaidjian's description was assisting Dr. Gomez in treating patients at the detention center. *Id.*, docs. F at 10, H at 12. Kalaidjian's mother filed a habeas petition, *id.*, doc. A, but received a response informing her that her daughter had not been detained. *Id.*, doc. B.

Several years later the bodies of a man and woman who were among four people killed in an alleged shootout with police and Army forces on March 18, 1977 were identified as Norberto Gomez and Elena Kalaidjian. According to the police report, the four persons were observed at 1:15 a.m. emerging from a vehicle on a Buenos Aires street. They were asked to stop, at which time they began firing on the joint forces. All four were killed. *Id.*, doc. M. The joint forces suffered no injuries, except for one officer who allegedly received "a minor injury on his right hand, without any negative results." *Id.* at 18.

Tests for the presence of gunpowder markings on the hands of all four victims proved negative. *Id.*, doc. O at 21. Three of the four weapons allegedly found on the bodies were defective, although able to fire. *Id.*, doc. X. The bodies were ordered buried by Colonel Roualdes of the First Army. *Id.*, doc. Q. Suarez–Mason ordered the investigation closed on October 19. *Id.*, doc. Y.

### b. *Finding re: Probable Cause*

Argentina has shown probable cause in relation to these charged homicides. The testimony of numerous witnesses that Gomez and Kalaidjian were in custody at an Army run secret detention center discredits the report of an alleged "confrontation" with a carload of subversives. Moreover, the forensic evidence further reveals the falsity of the police report. Once again there were no gunpowder markings on *any* of the victims' hands. Three of their alleged weapons were defective. Finally, the joint forces once again managed to wipe out a gang of alleged subversives without suffering a single casualty.

Despite this evidence that the victims were executed while in custody, and that the alleged shootout was staged, Suarez–Mason ordered the investigation summarily closed. This is sufficient to support the assertion of his complicity in, and likely authorization of, the executions. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States on the homicides of Norberto Gomez, Elena Kalaidjian, and the two unidentified victims allegedly killed in the confrontation on March 18, 1977.

### 8. *Volume L–11* (Homicide of Carlos Alberto Moreno)

#### a. *Facts*

Carlos Alberto Moreno, a young attorney, disappeared in Buenos Aires on April 29, 1977. A witness in the area reported seeing two men with weapons force a man into a car. L–11, doc. A. Moreno was later seen on May 3rd when he appeared at the home of Valentin Bulfoni in the City of Tandel. He told Bulfoni that he had been kidnapped, but had escaped. Bulfoni refused to allow him to enter. Several minutes later a red automobile occupied by two or three armed persons stopped outside the house. Moreno attempted to flee and was

fired upon by the occupants. *Id.,* docs. B & C. Soon thereafter he was captured, apparently unharmed, and placed in the vehicle.

Apparently, the persons described above were either Army personnel or Federal Police under the Zone One Command. One described himself to a witness as being from the Federal Police, and said he was capturing a subversive. *Id.,* doc. D at 7. Three local police officers report arresting a man who had been seen running through the bushes near the Bulfoni house. The man identified himself as Sergeant Ojeda of the Army and said he was acting under orders. After being identified, Ojeda was released. *Id.,* docs. E, F, G. Another local policeman reports coming across Ojeda, as well as an Army Lieutenant and another man in uniform who told him that they were trying to "round up" an individual. The local police therefore retreated. *Id.,* doc. G at 12.

According to a May 10 newspaper account, Moreno was killed while attempting to escape during transportation to a military unit for detention. *Id.,* doc I at 15, 16. The release does not state the date of this alleged escape attempt. However, according to the Death Certificate from the Buenos Aires Registry of People, Moreno died *on May 10* at 11 o'clock p.m. of "multiple bullet wounds." *Id.,* doc. H at 14. There is no indication what time the release was issued.

According to a Buenos Aires police document, the body was delivered from Tandil on May 20 "by local military personnel." *Id.,* doc. I at 17. His mother states that when she recovered the body it had two bullet holes in the back and showed signs of torture. *Id.,* doc. M at 29.

### b. *Finding re: Probable Cause*

The evidence is sufficient to establish probable cause. It appears clear from the record that Moreno's captors were Army personnel. Witnesses testify that he was apprehended and taken into custody on May 3. The circumstances of his death— shot while allegedly trying to escape on May 10—are consistent with the apparent executions of other victims in this proceed-

ing. Moreover, Moreno's death certificate was dated at 11 o'clock p.m. on the same day the Army reported his death. Thus it appears that the Army report predates his death, casting further doubt on the veracity of the escape report.

9. *Volume L–12* (Homicides of Rodolfo Goldin, Luis Maria Gemetro, Daniel Jesus Ciufo, Catalina Oviedo de Ciufo, Luis Alberto Fabbri, Claudio Gimbini, Elizabeth Isabel Kasserman, Maria Cristina Bernat, Julio Francisco Bernat, Luis Eduardo DeCristofaro, Mario Sagroi, Manuel Arasumiv, Esteban Adrian, Nelo Gasparini and two unidentified victims)

### a. *Facts*

According to the testimony of Elena Alfaro, she was seized in April 1977 and then imprisoned with her companion Luis Alberto Fabbri in the "El Vesubio" detention center. She reports that she was tortured and raped while she was four months pregnant. L–12, doc. F at 12. She also specifically recalls a visit to the camp by Suarez–Mason near the end of her pregnancy, during which she heard him order the camp officers to set her free. Prior to her release, Suarez–Mason asked her if she would give up her child to a military family. She refused. *Id.* at 11–12.

Alfaro reports that on the evening of May 23, 1977 she assisted in the preparation for transfer of approximately 16–17 persons from "El Vesubio." Among these were Rodolfo Goldin, Daniel Jesus Ciufo, Catalina Oviedo de Ciufo, Luis Alberto Fabbri, Claudio Gimbini (or Combini), Elizabeth Isabel Kasserman, Mario Sagroi, Esteban Adrian, and probably Luis Maria Gemetro. *Id.* at 10, 11, 13. These persons, possibly along with several others, were killed in an alleged shootout with security forces on May 24, 1977. According to a news report derived from a Zone One Command circular, the victims were meeting at a chalet in Monte Grande to plan future terrorist actions when security forces broke in. The "terrorists" were allegedly killed in the ensuing gunfight. *Id.,* doc. E at 9.

### b. *Finding re: Probable Cause*

The evidence clearly supports the conclusion that the shootout in Monte Grande was staged. Several of the alleged terrorists who were killed were transferred together from a secret detention center run by Suarez–Mason on the evening of May 23. Thus, they could not possibly have been involved in the planning and consummation of an alleged terrorist meeting on the 24th. Rather, the evidence creates probable cause to believe that they were executed pursuant to the order of Suarez–Mason, the Commander of both Zone One and the detention center from which the victims were transferred.

However, due to Argentina's conflicting evidentiary presentation, it is extremely difficult to determine how many persons died or who those victims were. Argentina alleges that there were 16 victims. However, it has submitted 23 death certificates to this Court. *Id.*, doc. H at 20–42. It has also submitted a communique from the Buenos Aires Ministry of Persons, *id.*, doc. G at 16–18, which lists 16 bodies, but when it is cross checked against the death certificates there appear to be 20 bodies.[15] Moreover, the press account of the "confrontation" states only that "extremists" were killed, but does not say how many there were. *Id.*, doc. E at 9.

This incomplete documentation creates confusion not only about the number of victims, but also about their identities. The spread sheet in Argentina's *Supplemental Exhibits Volumes 4–15*, filed on July 8, 1987, lists 14 named victims in vol. L–12, along with an undisclosed number of unidentified victims (presumably two). However, Argentina's *Response to the Court's Inquiry Regarding Homicides*, filed March 25, 1988, omits two of the victims listed on the spread sheet (Luis Alberto Fabbri and Mario Sagroi) and adds two additional unidentified victims. Finally, Argentina refers in its March 25 filing to an Army circular which allegedly named 12 of the victims. But this circular appears nowhere in volume L–12.

In light of Argentina's evidentiary presentation, the Court will start with the assumption that the 16 charged homicides are the 14 people listed on the Supplemental Exhibit chart, along with two unidentified victims. Where the evidence is sufficient to show that a specifically named victim was in the group transferred, or was subsequently killed with the transferees in the alleged confrontation on May 24, this will be sufficient to satisfy Argentina's probable cause burden in relation to that homicide.

### RODOLFO GOLDIN

Argentina has shown probable cause in relation to this homicide. The testimony of Elena Alfaro establishes that Goldin was in the group transferred from the detention center on the evening of May 23. *Id.*, doc. F at 10. The death certificate states that he died of acute internal hemorrage on May 24. *Id.*, doc. H at 33.

### DANIEL CIUFO

Argentina has shown probable cause in relation to this homicide. Elena Alfaro identifies the victim as among those transferred from the detention center on the evening of May 23. *Id.*, doc. F at 10. The registry of persons list identifies him as having died on May 24, 1977. *Id.*, doc. G at 17. There is also a death certificate for Ciufo, *id.*, doc. H at 24, and another death certificate which corresponds to both the

---

**15.** When the communique and the death certificates are combined there are a total of twenty-seven docket numbers, although some are duplicates of named victims. Argentina makes no attempt to explain what the docket numbers stand for, or whether there are other duplicates: (1) Claudio Gimbini, docket nos. 162A, 271A; (2) Unidentified Male, Age 30, no. 162B; (3) Unidentified Female, Age 26, no. 163B; (4) Maria Bernat, nos. 164B, 592A; (5) Catalina Oviedo de Ciufo, nos. 165B, 273A; (6) Unidentified Male Age 35, no. 166B; (7) Daniel Ciufo, nos. 167, 167B, 275A; (8) Unidentified Male, Age 35, no. 222A; (9) Unidentified Male, Age 45, no. 223A; (10) Unidentified Male, Age 37, no. 224; (11) Unidentified Male, Age 30, nos. 225, 225A; (12) Unidentified Male, Age 45, no. 226A; (13) Elizabeth Kasserman, no. 227A; (14) Unidentified Male, Age 30, no. 228A; (15) Unidentified Male, Age 30, no. 229A; (16) Luis Gemetro, nos. 230A, 272A; (17) Unidentified Female, Age 35, no. 231A; (18) Rodolfo Goldin, no. 274A; (19) Julio Bernat, no. 639A; (20) Luis DeCristofaro, no. 640A.

docket number (167) and description (Male, Age 28) of Ciufo on the registry of persons list. *Id.* at 37. Both certificates list him as having died of "acute internal hemorrage" on May 24.

## CATALINA OVIEDO de CIUFO

Argentina has shown probable cause in relation to this homicide. Elena Alfaro identifies the victim as among those transferred from the detention center on the evening of May 23. *Id.*, doc. F at 10. A death certificate states that she died of "acute internal hemorrage" on May 24. *Id.*, doc. H at 26. The registry of persons list corroborates the death certificate. *Id.*, doc. G at 16. There is also a death certificate for an unknown female which matches the docket number for Catalina Ciufo on the registry of persons list. *Id.*, doc. H at 36.

## LUIS FABBRI

Argentina has shown probable cause in relation to this homicide. Elena Alfaro, the victim's lover and companion, identifies him as among those transferred on the evening of May 23. *Id.*, doc. F at 10. While there is no death certificate bearing Fabbri's name, he has never been seen again. In light of the fact that many of those who were transferred with him were definitively killed in the falsified confrontation, as well as the fact that he has not been seen again, the Court finds the evidence sufficient to establish probable cause to believe that he was among those killed.

## CLAUDIO GIMBINI

Alfaro's positive identification of this victim as among those transferred, combined with the death certificate and the listing from the registry of persons, are sufficient to establish probable cause in relation to the charged homicide. *Id.*, docs. F at 10, 11, 12; G at 17; H at 29.

## ELIZABETH ISABEL KASSERMAN

Alfaro's positive identification of this victim as among those transfered, combined with the listing from the registry of persons showing that she died of "acute internal hemorrage" on May 24, 1977, are sufficient to establish probable cause in relation to the charged homicide. *Id.*, docs. F at 10,

11, 13; G at 17. There is also a death certificate which matches both the docket number (227A) and description (Female, Age 28) of Kasserman on the registry list. *Id.*, doc. H at 35.

## MARIO SAGROI

Argentina has established probable cause in relation to this charged homicide. Elena Alfaro has positively identified Sagroi as among those transferred on May 23. *Id.*, doc. F at 10. In light of the evidence that the other named persons who were transferred were killed in the falsified confrontation on May 24, the Court finds this fact sufficient to establish probable cause to believe Sagroi was among those killed.

## ESTEBAN ADRIAN

For the reasons stated in relation to the homicide of Mario Sagroi, the Court finds that Argentina has established probable cause in relation to this charged homicide. *Id.*, doc. F at 10, 11.

## LUIS MARIA GEMETRO

Argentina has established probable cause in relation to this charged homicide. Elena Alfaro testified that she believes Gemetro was among the group transferred on May 23. *Id.*, doc. F at 13. A death certificate establishes that he died of "acute internal hemorrage" on May 24 at the site of the alleged confrontation. *Id.*, doc. H at 21. The registry of persons list corroborates the death certificate. *Id.*, doc. G at 18. There is also a death certificate which matches the docket number (230A) for Gemetro on the registry of persons list. *Id.*, doc. H at 41.

## MARIA CRISTINA BERNAT

Argentina has established probable cause in relation to this charged homicide. Although Alfaro does not recall this victim, a death certificate establishes that she died on May 24 at the site of the alleged confrontation. *Id.*, doc. H at 28. The registry of persons list corroborates the death certificate. *Id.*, doc. G at 17. There is also another death certificate which matches Maria Bernat's docket number on the registry list (164B). *Id.*, doc. H at 27.

## JULIO FRANCISCO BERNAT

Argentina has established probable cause in relation to this homicide. Although Alfaro also does not recall this victim, a death certificate establishes that he died of "acute internal hemorrage" on May 24 at the site of the alleged confrontation. *Id.*, doc. H at 31.

## LUIS DECRISTOFARO

Argentina has established probable cause in relation to this charged homicide. A death certificate establishes that DeCristofaro died of "acute internal hemorrage" on May 24 at the site of the alleged confrontation. *Id.*, doc. H at 20.

## NELO GASPARINI, MANUEL ARASIMIV and TWO UNIDENTIFIED VICTIMS

■ Argentina has failed to establish probable cause in relation to these four charged homicides. Argentina makes reference to an Army circular which names Arasimiv and Gasparini as among those killed on May 24. However, this document is nowhere in the record.[16] In fact, the Court does not find the names of, or any information about, either of these alleged victims anywhere in volume L–12.

The only place Arasamiv and Gasparini's names appear is in the opinion of the Federal Criminal and Correctional Court of Appeals of the Republic of Argentina, which found that they were among those killed on May 24. *See* A–2 at 78. However, that Court based its finding on the aforementioned Army circular which, for unknown reasons, Argentina has failed to include in its submission to this Court. Thus, the charges as to Arasimiv and Gasparini stand in essentially the same posture as the charged homicides of unidentified victims.

The only evidence in the record on which the Court could find probable cause as to the unidentified victims is the fact that there appear to be ten death certificates for unidentified victims, and which have not been linked to any named victim.[17] However, four of the named victims have two death certificates with different docket numbers.[18] Thus, the Court cannot conclude that the ten additional death certificates represent actual victims, as they could merely be additional certificates issued for named victims.

Argentina has made no attempt to explain how some victims got two death certificates with different docket numbers, nor has it attempted to explain which of the many death certificates submitted allegedly correspond to the unidentified victims. Accordingly, the Court concludes that Argentina has failed to establish probable cause as to Arasimiv, Gasparini, or the two unidentified victims.

10. *Volume L–13* (Homicide of Jorge Oscar Fernandez)

### a. *Facts*

On September 16, 1977 at approximately one o'clock a.m. the victim was kidnapped from his parents' home by persons whom his sister identifies as Army personnel. L–13, doc. B. He was seen in custody, by both his brother and several other witnesses, at the Brigada de Investigaciones de Las Flores and Monte Pelone detention centers. *Id.*, docs. A, C, D, E. He was last seen sometime in late October or early November. *Id.*, doc. C. The victim's brother, who was also in detention, reports that the captors wore Army uniforms, and that he was fed on plates bearing Army insignia. *Id.*, doc. A. Witnesses report that the victim was severely beaten and tortured with electric shocks. In early November, the Army released a circular reporting that the victim had been killed in a

---

**16.** The circular is not in volume L–12. Argentina has not cited to it, and if it appears elsewhere in the voluminous record this Court is unable to locate it.

**17.** Docket numbers 162B, 163B, 166B, 222A, 223A, 225A, 226A, 228A, 229A, 231A.

**18.** (1) Daniel Ciufo, doc. H at 24 (naming Ciufo), 37 (corresponding to D. Ciufo's docket no. in registry of persons list); (2) Catalina Oviedo de Ciufo, doc. H at 26 (naming C. Oviedo), 36 (corresponding to C. Ciufo's docket no. on registry of persons list); (3) Luis Gemetro, doc. H at 21 (naming Gemetro), 41 (corresponding to Gemetro's docket no. on registry of persons list); and (4) Maria Bernat, doc. H at 27 (corresponding to M. Bernat's docket no. on registry of persons list), 28 (naming M. Bernat).

raid on a "leftist cell in Olivarria." *Id.*, doc. G. A death certificate reports that he died of a bullet wound. *Id.*, doc. H.

### b. *Finding re: Probable Cause*

Argentina has shown probable cause in relation to this homicide. The testimony of numerous witnesses establishes that the victim was in custody at a secret detention center, in poor physical condition, in late October 1977. Thus, unless he escaped custody, regained his strength, and formed a "leftist cell in Olivarria" within a period of several days, the explanation of his death in an armed conflict is impossible. The evidence supports the conclusion that Fernandez was executed and the report of his death falsified. Such execution occurred while he was in custody of the Zone One Command.

Given Suarez–Mason's personal control of both the selection of targets and the administration of the secret detention centers, Argentina's showing is sufficient to establish probable cause to believe the execution was authorized by him. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States on the homicide of Jorge Oscar Fernandez.

### 11. *Volume L–14* (Homicides of Selma del Carmen Mopardo, Alejandra Beatriz Roca and Daniel Arteaga)

#### a. *Facts*

On November 13, 1976 the victims Mopardo and Roca were both abducted from their homes by persons describing themselves as "the Argentine Army," L–10, doc. A at 1, and "from the First Army Corps." *Id.*, doc. C at 4; E at 9. A witness, Nora Beatriz Lopez Tome, reports being transported with Roca and Mopardo by members of the armed forces. *Id.*, doc. D. According to police reports these two victims, along with two unidentified males, were killed in a shootout with police in December 1976. One of the males appears to have been identified as Daniel Arteaga. *Id.*, docs. F, G, H, I (police statements); L (death certificates of Roca and an unknown male); E at 10 (testimony identifying Arteaga as killed in the incident); O at 25–26 (autopsy report identifying Mopardo).

The police stated that they observed a car driving suspiciously and ordered it to stop. The occupants began firing and were killed in the ensuing gunfight. *Id.*, docs. F, G, H, I. Suarez–Mason ordered that the investigation of the case be closed. *Id.*, doc. P at 31. There are several discrepancies in the official explanation. First, the father of Alejandra Roca states that she did not know how to drive, although she was allegedly in the driver's seat of the vehicle. *Id.*, doc. C at 6. Second, there is testimony by Roca's sister that a doctor informed her that two of the four bodies were in an advanced state of decay when they arrived at the police station immediately after the incident. *Id.*, doc. E at 11. Finally, a 1984 search of Federal Police records failed to uncover the names of the three alleged officers who participated in the shootout. *Id.*, doc. J at 16–19.

### b. *Finding re: Probable Cause*

Argentina has established probable cause in relation to these charged homicides. The testimony clearly establishes that the victims were in custody of the First Army in one of the detention centers which numerous of Suarez–Mason's subordinate have said were personally administered by him. The report of a confrontation is rendered impossible by the fact that the witnesses were in custody, and thus could hardly have been out suspiciously driving around. Moreover, despite the highly suspect explanation of the deaths (apparently prepared by several officers who did not exist), Suarez–Mason ordered the investigation summarily closed.

Suarez–Mason's direct involvement in this incident, along with the other evidence in the record, creates probable cause to believe he authorized the executions and staged confrontation. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States on the homicides of Selma del Carmen Mopardo, Alejandra Beatriz Roca, and Daniel Arteaga.

12. *Volume L–15* (Homicides of Carlos Luis Lahitte and Laura Estela Carlotto).

### a. *Facts*

On March 2, 1978 persons in civilian clothing abducted Carlos Luis Lahitte from his sister's apartment in Buenos Aires. These individuals can be identified as members of the security forces through testimony that (1) they identified themselves as police and one person showed a badge, L–15, doc. A; (2) some of their clothing appeared to be of military issue, *id.*, doc. B; and (3) one person referred to his superior as "lieutenant." *Id.*, Two witnesses later saw Lahitte at a detention center along with a woman named Laura Estela Carlotto, who had disappeared on November 12, 1977.[19] *Id.*, docs. E & F. According to these witnesses, Carlotto and Lahitte were "transferred" together after midnight on the early morning of August 25, 1978. *Id.*[20]

Official records report that Lahitte died in a confrontation with security forces on August 25, 1978. *Id.*, docs. J at 16; K at 23. A death certificate reports that Carlotto died in the same manner at between 1:20 and 1:40 on the 25th.[21] *Id.*, doc. H at 11–12. According to a post-exhumation report conducted in 1985, Carlotto's "skull is fragmented into a number of small segments due to an explosive wound, typical of a shot fired at short range." *Id.*, doc. I at 14. There were three bullets, all inside the skull. *Id.*

### b. *Finding re: Probable Cause*

Argentina has shown probable cause in relation to each of the two charged homicides. The victims were in custody at a secret detention center as of midnight on August 24, 1978. They were killed shortly afterward. The fact that they were "transferred" together, along with the fact that three bullets were found in Carlotto's skull create a high probability that they were executed.

Suarez–Mason's direct control of the detention centers, along with the other evidence in the record, creates probable cause to believe the executions were authorized by him. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States on the homicides of Carlos Luis Lahitte and Laura Estela Carlotto.

## V.

### The Forgery Charge

Suarez–Mason is charged with one count of aiding and abetting in the commission of forgery of a public document in violation of Articles 292 and 45 of the Argentine Penal Code. *See* B–1. Suarez–Mason presents two arguments in opposition. First, he argues that Argentina has not made a showing of probable cause. Second, he argues that extradition on this charge is barred by Argentina's failure to comply with Section 607 of the Argentine Code of Criminal Procedure. The Court will address each of these arguments in turn.

### A. *Probable Cause*

■ Argentina has presented evidence which establishes that Suarez–Mason had in his possession a passport in his name containing a forged renewal. B–1 at 4 (testimony of Ricardo Recondo). Specifically, the renewal purports to have been validated by the signature of "*Alberto* Cesar Castillo." (Emphasis added). However, the head of the passport division of the Argentine Federal Police at the time was *Alfredo* Castillo. Moreover, records show that Castillo was on vacation on the

---

**19.** Carlotto was pregnant at the time of her abduction. A witness reports that on June 25, 1978 Carlotto was taken from detention to a military hospital where, in handcuffs, she gave birth to a boy and named him Guido. Five hours later the baby was taken from her and she was returned to detention. L–15, doc. G. The child's fate is unknown.

**20.** One witness report states that the transfer occurred around midnight on August 14. L–15, doc. E at 6. The other states that it occurred in the early morning hours of the 25th. *Id.*, doc. F at 8. Given the time and circumstances of death, the Court assumes the first date [August 14th] to actually be August 24.

**21.** The death certificate does not state whether the death occurred at 1:20 A.M. or P.M.

date of the alleged renewal. *Id.* at 5, 13. Thus, he could not have signed the validation.

The passport also bears a signature in the name of Salvador Maria Grandolio, assistant to Mr Castillo. However, Grandolio testified that the signature on the passport bore no resemblance to his actual signature. He also testified that the seal on the passport is not authentic. *Id.* at 7. This testimony was corroborated by a handwriting analysis undertaken by Deputy Commander Juan Carlos Alegretti. *Id.* at 17, 18. Alegretti also found the seal to be a forgery. *Id.* at 21.

The Court finds that this evidence establishes probable cause of Suarez–Mason's guilt. The forged passport was in Suarez–Mason's possession. Moreover, given the prosecutions of former high-ranking Army Commanders occurring in Argentina after the establishment of democratic rule, and his personal summons to appear, he had obvious motive to want to leave the country and to forge any documents which would facilitate absconding. There is no evidence that anyone else would have an interest in forging a renewal of his passport. The evidence is clearly sufficient to meet Argentina's probable cause burden.

**B. Section 607**

■ Suarez–Mason next argues that Argentina has failed to comply with section 607 of the Argentine Code of Criminal Procedure, which provides as follows:

> The alleged forged document will be presented to the defendant during the examination, so he may declare if he recognizes it and it will be required that he sign all its pages. In the event that he cannot or does not want to sign it, this fact will be brought up during the proceedings.

Suarez–Mason argues that Argentina has failed to comply with this requirement, and he has submitted an expert declaration to the effect that such failure bars prosecution in Argentina. *See Jamie Smart Affidavit.* Argentina has submitted an expert declaration stating that failure to comply does not bar prosecution. *See Second Dec-*

*laration of Miguel Garro.* The Court is of the opinion that resolution of this question of Argentine law is unnecessary at this time. This Court's determination is limited to whether the requirements of extradition have been met. The fact that Argentina may be required to follow further procedural strictures in prosecuting Suarez–Mason in Argentina does not change that function.

Moreover, the Court notes that section 607 appears to require presentation of the document after the alleged offense has been committed and during the interrogation of the accused. But Suarez–Mason's departure from Argentina has rendered it impossible for him to be interrogated by the Argentine authorities. Thus it appears that the prosecution has not yet reached the stage where presentation of the forged document would be required. This requirement may very well be satisfied if Suarez–Mason is eventually returned to Argentina. In any event, the question of whether section 607 has been satisfied is one for the Argentine Court to resolve. It does not impact upon this Court's determination of extraditability. Accordingly, the Court certifies the extraditability of Suarez–Mason to the Secretary of State of the United States for the offense of forgery.

## VI.

## AFFIRMATIVE DEFENSES

Notwithstanding Argentina's showing with regard to the six essential elements discussed above, Suarez–Mason asserts that extradition for the homicides is barred by the Military Offense and Political Offense exceptions of the treaty. *See Treaty,* art. 7(1)(d), (e).

**A. Military Offense Exception**

■ Suarez–Mason briefly asserts, *opposition,* at 42, that all of the alleged offenses fall within Article 7(1)(d) of the treaty, which provides that "[e]xtradition shall not be granted ... [w]hen the offense in respect of which the extradition is requested is a military offense and does not fall within the jurisdiction of ordinary criminal

law." He offers no elaboration or argument in support of this assertion.

In the Court's view this argument is without merit. The crimes for which Suarez–Mason is charged are common offenses defined exclusively by Articles 79, 80 and 292 of the Argentine Penal Code. Homicide and forgery are also common offenses under the laws of the United States. Military offenses include those such as sedition, mutiny, and desertion, which are outside the realm of ordinary criminal law. *See Declaration of Miguel Garro*, at 38–39 (discussing concept of military offenses under Argentine law). Accordingly, the Court finds that extradition is not barred by the Military Offense exception.

### B. *Political Offense Exception*

Suarez–Mason next relies on Article 7(1)(e) of the treaty, which provides that extradition shall not be granted "[w]hen the offense in respect of which the extradition is requested is of a political character." This "political offense" exception has been included in nearly all extradition treaties entered into by the United States since the early to mid 19th century. A comprehensive discussion of the background and rationale for the exception is contained in *Quinn v. Robinson*, 783 F.2d 776, 792–810 (9th Cir.1986). *See also* Note, *Extradition in an Era of Terrorism: The Need To Abolish The Political Offense Exception*, 61 N.Y.U.L.Rev. 654, 658–665 (1986) (discussing background and purposes of the exception) [hereinafter *Era of Terrorism* ].

There is an initial point of historical context which bears emphasis. The exception, which prevents extradition of otherwise extraditable crimes, arose in the aftermath of the American and French Revolutions and was consciously designed to protect the right of citizens to rebel *against* unjust or oppressive government. *See Quinn*, 783 F.2d at 792–93, and sources cited therein. When as here, the exception is invoked by a former government official to prevent extradition for actions taken in the course of *suppressing* a rebellion, the Court is travelling in largely uncharted territory.[22]

For this reason, the Court must address two preliminary issues: (1) whether the exception may be relied upon by a former government official; and (2) if so, what test is to be applied in determining whether the former official's actions fall within it.[23] For the reasons stated below, the Court assumes, without deciding, that the exception is applicable to former government officials. Proceeding from this assumption, the Court holds that the "incidence" test is to be applied in judging Suarez–Mason's actions and that the charges of murder and forgery in this case fall outside the realm of the exception. Therefore, it does not bar the extradition of Suarez–Mason.

#### 1.

■ Suarez–Mason argues that the political offense exception is applicable to former government actors for conduct in the course of suppressing rebellious uprisings. Argentina appears to interpret Ninth Circuit authority as allowing invocation of the exception by government officials in limited circumstances, argues that it is inapplicable to this case, and offers a test for the exception which the Court believes would render the exception meaningless.[24] There

---

**22.** In the Court's view there is a significant question whether the political offense exception offers manageable standards appropriate for judicial resolution. Some have argued that this is an issue appropriately resolved by executive action. Nevertheless, this argument has been rejected by both the Ninth Circuit and other courts of appeals and therefore this Court is not free to reconsider it. *See, e.g., Quinn*, 783 F.2d at 787–790. *See also In Re Mackin*, 668 F.2d 122, 132–37 (2d Cir.1981); *Eain v. Wilkes*, 641 F.2d 504, 513–18 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

**23.** The Court has been assisted in its consideration of these issues by the brief of *Amicus Curiae* Frank C. Newman, and the responses thereto by counsel.

**24.** Argentina would allow a former official to rely on the exception only where his actions were "legal domestically and under international law." *Argentina's Reply*, at 53. However, by its very nature the political offense exception applies only to conduct which is otherwise extraditable. If the actions were legal domestically they would not meet the dual criminality requirement and would thus not be extraditable.

are at least two district court cases within this Circuit which assume, without analysis, that the exception applies to former government officials. *See In Re Ezeta*, 62 F. 972 (N.D.Cal.1894); *Extradition of Artukovic*, 628 F.Supp 1370, 1376 (C.D.Cal. 1986).[25]

The Ninth Circuit also applied the exception to actions of a former government official in *Karadzole v. Artukovic*, 247 F.2d 198 (9th Cir.1957), although that much-criticized opinion was vacated by the Supreme Court and held in *Quinn* to be of no precedential value. 783 F.2d at 799 n. 20. Reexamining the issue in *Quinn*, Judge Reinhardt suggested in dicta that the rationales underlying the exception counseled its application to former officials, although he explicitly left the question unresolved. 783 F.2d at 800 n. 24. Absent binding Ninth Circuit authority, this Court proceeds to independently consider the applicability question.

Judge Reinhardt recognized three principles underlying the exception: *first,* a desire to protect those rebelling against autocratic regimes; *second,* a concern that individuals should not be subjected to unfair trials and punishment for having engaged in political activity offensive to those now in power; and *third,* commitment to non-intervention in the internal affairs of foreign countries. *Id.* at 793, 800 n. 24. In his view, both the second and third principles support application of the exception to former government actors. *Id.*

In this Court's view, however, the principles underlying the exception counsel against extending it to cover the actions of former government officials. In explaining the Court's reasoning it is important to first note that the exception necessarily applies only to conduct which is otherwise extraditable, i.e., *illegal* conduct covered by treaty. *See supra* note 24. Legal conduct taken in the course of suppressing a rebellion is not extraditable. Therefore, extension of the exception to former government

officials serves only to protect their illegal actions taken in the course of suppressing rebellions. For several reasons, such an extension undermines the principles which form the basis of the exception.

*First,* this extension would directly contravene the primary rationale for the exception—that of protecting acts of rebellion against oppressive rule. The exception, established in the era of the French and American revolutions, was not intended to remain neutral between the forces of rebellion and the forces of suppression. Rather, as the *Quinn* Court recognized, it was based on "a belief that individuals have a 'right to resort to political activism to foster political change.'" 783 F.2d at 793, *quoting* Note, *American Courts and Modern Terrorism: The Politics of Extradition,* 13 N.Y.U.J.Int'l L. & Pol. 617, 622 (1981). *See also* The Declaration of Independence, para. 1 (U.S. 1776). Extension of the exception to former officials effectively protects actions taken in the course of quashing the political activism that the exception was designed to protect. Moreover, it protects *illegal* and thus presumably despotic actions by the forces opposing change. The exception was not conceived as a neutral principle, but rather a conscious choice in favor of the forces of political evolution. *See Quinn,* 783 F.2d at 792 (discussing "concept of justified political resistance" underlying the exception). To extend it to protect illegal actions undertaken to suppress this evolution contravenes the very purpose of the exception.

*Second,* while protecting officials of governments no longer in power from being returned to face unfair trials may be a concept of legitimate force, it does not follow that such officials should be protected from being justly called to account for their illegal actions undertaken while in power. The concern with protecting the subject of extradition from unfair trial and punishment is in large measure served by the doctrines of "specialty," and

*See, e.g., Caplan v. Vokes,* 649 F.2d 1336, 1343 (9th Cir.1981).

**25.** The Ninth Circuit subsequently denied a stay pending appeal in the *Artukovic* case, although it did not address the applicability question. *Artukovic v. Rison,* 784 F.2d 1354 (9th Cir.1986).

"dual criminality," as well as the incentive of reciprocity which underlies all of extradition law. "Specialty" insures that the extraditee be tried only for those crimes which a United States Court finds probable cause to believe he committed. *See United States v. Rauscher*, 119 U.S. 407, 420–21, 7 S.Ct. 234, 240–41, 30 L.Ed. 425 (1886) (articulating the principle of specialty). "Dual criminality" requires that the conduct be recognized as criminal by both the United States and the requesting country. *See, e.g., Caplan v. Vokes*, 649 F.2d 1336, 1343 (9th Cir.1981). The desire for reciprocity and cooperation in future cases encourages both countries to abide by these principles. In short, the basic tenets of extradition law act as powerful deterrents to the threat of unjustified persecution. Thus, extension of the political offense exception would serve primarily to prevent former officials from being justly returned and brought to trial for the violations of law they committed while in power.

*Third*, this Court thinks it misleading to characterize the exception as founded upon commitment to non-intervention in the internal affairs of foreign countries. In fact, the exception was designed to protect the acts of rebels, and thus to promote rebellion against existing rule. *See* The Declaration of Independence, para. 1 (U.S. 1776) ("whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it...."), quoted in *Quinn*, 783 F.2d at 792. In the Court's view, this is correctly described as an interventionist principle. By protecting the right of rebellion the exception advocates and protects action taken against the existing legal order, thus intervening in the requesting nation's political

affairs.[26] *Accord Era of Terrorism*, at 664 ("Denial of extradition is probably more likely to be perceived by the requesting state as an act of intervention in its domestic affairs that advances the interests of the adversary.").

For these reasons, the Court concludes that the principles underlying the political offense exception are ill-served by extending its protection to former government officials. Therefore the Court declines to so extend it. Nevertheless, given the fact that the Ninth Circuit has stated that the issue remains open, the Court will assume *arguendo* that the exception may be invoked by former government actors and therefore will proceed to determine and apply the proper test in such an instance.

2.

◼ As discussed in *Quinn*, at 794–797, varying tests have been applied in different nations to determine what precisely constitutes a "political" offense. United States courts have consistently adhered to the "incidence" test enunciated in *In Re Ezeta*, 62 F. 972 (N.D.Cal.1894). As refined by later decisions, that test has two components: (1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense; and (2) a charged offense that is "incidental to" the uprising. *See, e.g., Quinn*, 783 F.2d at 797. *See also Eain v. Wilkes*, 641 F.2d 504, 518 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Sindona v. Grant*, 619 F.2d 167, 173 (2d Cir.1980).

Those courts which have found the exception applicable to conduct of government actors have also used the incidence test, although none has actually analyzed the appropriateness of this application.

---

**26.** Any consideration of the political offense doctrine must recognize that the world context of its birth no longer exists. The reality of multi-national terrorism, taking full advantage of modern mobility and communications, as well as the advanced technology of death, have forever blurred the perception of rebellion that underlies the concept. There is growing recognition that terrorist acts of death and destruction must be held accountable to the rule of law, and that there is no continuing justification for extradition principles which serve to interrupt the legal process.

Commentators and courts have put forth persuasive arguments that acts of international terrorism which violate international norms should not be considered as within the rebellion context which forms the basis of the exception. *See generally In Re Doherty*, 599 F.Supp. 270, 274 (S.D.N.Y.1984), *Demjanjuk v. Petrovsky*, 612 F.Supp. 544, 570–71 (N.D. Ohio 1985) (both excluding crimes which are "inconsistent with international standards of civilized conduct"); *Era of Terrorism*, 61 N.Y.U.L.Rev. 654 (1986).

See, e.g., *Extradition of Artukovic*, 628 F.Supp. 1370, 1376 (C.D.Cal.1986); *Jimenez v. Aristequieta*, 311 F.2d 547 (5th Cir.1962); *In Re Ezeta, supra.* In *Quinn*, the Court examined the appropriateness of this application in dicta, concluding that it "makes little sense and leads to paradoxical results." 783 F.2d at 800 n. 24. The Court suggested, although it did not elaborate, that "the appropriate analogy to individuals acting in furtherance of an uprising is government officials acting in furtherance of a government policy." *Id.*

While this assessment raises significant questions it does not ultimately resolve the issue. The "incidence test" certainly leads to paradoxical results when applied to conduct of government actors. But this may be due less to the inappropriateness of the test than it is to the application of the exception in this context at all. *See supra* Part VI, B, 1. Moreover, it is not clear to the Court that a test of "government officials acting in furtherance of a government policy" will necessarily lead to less paradoxical results. Although *Quinn*'s footnote 24 effectively illustrates weaknesses in the application of the "incidence" analysis to government officials, it does not offer sufficient guidance to justify this Court departing from that analysis.

In *Artukovic v. Rison*, 784 F.2d 1354 (9th Cir.1986), decided the same week as *Quinn*, a different panel of the Ninth Circuit expressed no dissatisfaction with the District Court's application of the incidence test to a former government official. *See Extradition of Artukovic, supra* (District Court opinion). While there is no indication that the issue was raised before the *Artukovic* panel, it nevertheless appears that the present status of Ninth Circuit law is to apply the incidence test to the conduct of former government officials. This is the test which the present parties urge the Court to apply.[27] Absent some further articulation of a different test for former government officials, the Court concludes that Suarez–Mason's conduct must be judged by the incidence test.

3.

In order to establish that his conduct in relation to the 39 charged homicides for which the Court has found him extraditable comes within the ambit of the incidence test, Suarez–Mason must establish that: (1) there was an uprising or violent political disturbance occurring in Argentina at the time of the charged offenses; and (2) that the commission of the homicides was "incidental to" the uprising. *Quinn*, 783 F.2d at 797.[28] The Court assumes *arguendo* that Suarez–Mason can establish a "violent political disturbance" during the period in question, but finds that he has failed to establish that the commission of the homicides was "incidental to" the uprising.

The charged homicides began with the killings of four persons between May 18 and May 21, 1976. They ended with the killings of Carlos Luis Lahitte and Laura Estela Carlotto on August 25, 1978. The historical record is clear that President Peron declared a "State of Siege" on November 6, 1974 due to the alarming level of extremist political violence. However, this violence dissipated considerably following the military's assumption of rule and undertaking of the war against subversion. In fact, it appears that the violence ceased to pose any real threat to national security by the middle to end of 1977.

Suarez–Mason's witness, Maximo Gainza, editor of *La Prensa* newspaper, alluded

27. Argentina actually urges a modified version of the incidence test, requiring as a third component that the official's conduct was "legal domestically and under international law." *Argentina's Reply*, at 53. For the reasons stated in footnote 24 the Court rejects this added requirement.

*Amicus* urges the Court to articulate a different test, excluding internationally recognized torts cognizable in U.S. Courts from political offense protection. *Brief of Amicus Curiae*, at 11. In the Court's view, such a departure from present law, if it is appropriate, must come from the Ninth Circuit.

28. It is unclear from his memoranda whether Suarez–Mason argues that the forgery charge is also within the exception. However, there was clearly no uprising in Argentina in the period 1984–85 during which this offense occurred. Accordingly, the Court summarily dismisses any suggestion that the forgery constituted a political offense.

to the existence of numerous terrorist organizations which operated in Argentina. However, he was unable to cite specific examples of significant political violence after 1976. He conceded on cross-examination that two of the primary terrorist groups, the Monteneros and the E.R.P., had been significantly weakened if not destroyed by late 1976. *See Transcript of Hearing,* March 21, 1988. Nevertheless, because the issue is not free from doubt the Court assumes that Suarez–Mason has established the existence of a "violent political disturbance" during the period of all the homicides, but concludes that he cannot establish that the homicides were "incidental to" the uprising.

American Courts appear to have taken a liberal view toward the "incidental to" requirement. *See, e.g., Quinn,* 783 F.2d at 797; Garcia–Mora, *The Nature of Political Offenses: A Knotty Problem of Extradition Law,* 48 Va. L. Rev. 1226, 1244 (1962). Nevertheless, as persuasively articulated in *Extradition of Artukovic,* 628 F.Supp. 1370 (C.D.Cal.1986), the person seeking to invoke the exception must show a rational nexus between the uprising and the offense:

> [R]espondent cannot avail himself of the defense merely because the alleged crimes occurred at the same time as a political disturbance. A rational nexus between the alleged crimes and the prevailing turmoil must be demonstrated ... *the focus of the inquiry is on the circumstances, and on the status of those harmed,* and not on whether the acts merely were committed during the disorder.

*Id.* at 1376 (emphasis added). *See also Ornelas v. Ruiz,* 161 U.S. 502, 511, 16 S.Ct. 689, 692, 40 L.Ed. 787 (1896) (also focusing on status of persons killed and "character of the foray").

In the present case, Suarez–Mason has submitted *no* evidence to implicate any of the homicide victims in any sort of violent or revolutionary activity. Thus, there is absolutely nothing in the record which would support a finding of a rational nexus between the homicides and any uprising

which may have been occurring. Moreover, in denying the political offense exception in *Artukovic,* the District Court placed emphasis on the fact that the persons killed were disarmed prisoners. *Id.* at 1374. This is also true in the present case. The evidence supports the conclusion that each of the homicide victims had been taken into custody. Therefore, even if there were evidence that these persons had been involved in an uprising, they had been " 'arrested' or 'gathered' and, therefore, [were] not a military threat." *Artukovic,* 628 F.Supp. at 1374. In short, even assuming that Suarez–Mason has established the existence of an uprising, he has clearly and indisputably failed to establish that the present offenses were committed "incidental to" the uprising. Therefore, the Court holds that Suarez–Mason may not invoke the political offense exception.

### VII.

For the reasons stated above, the Court certifies the extraditability of respondent Carlos Guillermo Suarez–Mason to the Secretary of State of the United States on 39 counts of murder and one count of forgery.

In addition, the Court DENIES the petition of respondent Carlos Guillermo Suarez–Mason for a writ of habeas corpus.

IT IS SO ORDERED.